1  TRACY L. WILKISON
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   JENNA WILLIAMS (Cal. Bar No. 307975)
4  JASON C. PANG (Cal. Bar No. 296043)
   Assistant United States Attorneys
5  International Narcotics, Money
   Laundering & Racketeering Section
6       1400 United States Courthouse
        312 North Spring Street
7       Los Angeles, California 90012
        Telephone:    (213) 894-2690/2652
8       Facsimile:    (213) 894-0142
        E-mail:       jenna.williams@usdoj.gov
9                     jason.pang@usdoj.gov

10 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

11

12              UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,          | No. CR 20-543-SB

15              Plaintiff,            | GOVERNMENT'S TRIAL
                                      | MEMORANDUM
16              v.
                                      | Indictment:
17 ANDREW TATE (1),                   | November 30, 2020
   BOBBY LORENZO REED (2),
18 WILLIE ALSHA HILL (3), and         | Pretrial Conference:
   FRANK JONES (9),                   | May 17, 2022
19
                Defendants.           | Trial:
20                                    | June 7, 2022

21                                    | Last Day:
                                      | June 22. 2022
22

23      Plaintiff United States of America, by and through its counsel of record, the

24 United States Attorney for the Central District of California and Assistant United States

25 Attorneys Jason C. Pang and Jenna Williams, hereby files its trial memorandum.  This

26 trial memorandum supplements the trial memorandum filed on January 19, 2022 (Dkt.

27 No. 1175).

28

1    The government respectfully requests leave of the Court to supplement or modify

2  this memorandum as may be appropriate.

3  Dated: May 12, 2022                    Respectfully submitted,

4                                          TRACY L. WILKISON
                                           United States Attorney
5
                                           SCOTT M. GARRINGER
6                                          Assistant United States Attorney
                                           Chief, Criminal Division
7

8                                                /s/
                                           JASON C. PANG
9                                          JENNA WILLIAMS
                                           Assistant United States Attorneys
10
                                           Attorneys for Plaintiff
11                                         UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
# **TABLE OF CONTENTS**

2
DESCRIPTION                                                                              PAGE

3
**Contents**

4
TABLE OF AUTHORITIES ..................................................................................iv

5
MEMORANDUM OF POINTS AND AUTHORITIES ....................................1

6
I.      INTRODUCTION AND STATUS OF THE CASE ...................................1

7
II.     STATEMENT OF FACTS ..........................................................................1

8
    A.     Conspiracy to Distribute Drugs from H&E Shop and TNN Market ...........1

9
        1.      June 7, 2018 Distribution of Crack Cocaine......................................1

10
        2.      June 30, 2017 Distribution of Crack Cocaine....................................2

11
        3.      July 13, 2017 Distribution of Crack Cocaine ...................................3

12
        4.      August 3, 2017 Distribution of Crack Cocaine .................................3

13
        5.      August 9, 2017 Distribution of Crack Cocaine .................................3

14
        6.      August 15, 2017 Distribution of Crack Cocaine ...............................4

15
        7.      August 21, 2017 Distribution of Crack Cocaine ...............................5

16
        8.      September 13, 2017 Distribution of Crack Cocaine...........................5

17
        9.      October 3, 2017 Distribution of Crack Cocaine and
18
             Methamphetamine...............................................................................6

19
        10.     October 13, 2017 Distribution of Cocaine and
             Methamphetamine...............................................................................7

20
        11.     November 21, 2017 Distribution of Cocaine and
21
             Methamphetamine...............................................................................7

22
        12.     December 12, 2017 .............................................................................8

23
        13.     January 16, 2018 Distribution of Crack Cocaine and
             Methamphetamine...............................................................................8

24
        14.     February 1, 2018 Distribution of Crack Cocaine and
25
             Methamphetamine...............................................................................9

26
        15.     March 2, 2018 Distribution of Crack Cocaine and
             Methamphetamine...............................................................................9

27
        16.     May 3, 2018 Distribution of Crack Cocaine and
28
             Methamphetamine.............................................................................10

**<u>TABLE OF CONTENTS (CONTINUED)</u>**

<u>DESCRIPTION</u>                                                                                                  <u>PAGE</u>

17. May 22, 2018 Distribution of Methamphetamine ........................... 10

18. Title III Wiretap Interceptions ......................................... 11

B. Conspiracy to Smuggle Heroin into Solano State Prison ...................... 11

III. CHARGED STATUES AND ELEMENTS .......................................... 12

A. Conspiracy and Distribution........................................... 12

B. Aiding and Abetting ................................................. 13

IV. TIME ESTIMATE ...................................................... 14

V. LEGAL AND EVIDENTIARY ISSUES ........................................ 15

A. Transcripts of Recordings ............................................. 15

B. Defendants' Nicknames .............................................. 16

C. Defendant Tate's Incarceration and Defendant Reed's Shooting.............. 18

D. Recorded Statements by Defendants..................................... 18

1. Foundation .................................................. 19

2. Defendants' Statements Are Admissible Under Rule 801(d)(2)(A) Only When Offered by the Government................... 20

3. Defendants' Statements Are Admissible Under Rule 801(d)(2)(E) Only When Offered by the Government ................... 21

4. Defendants' Statements Are Inadmissible When Offered by Defendants Under Rules 801(d)(2)(A) and (d)(2)(E) ................ 23

5. Lay Interpretation............................................. 24

6. Recordings Must be Played in Open Court ......................... 24

E. Law Enforcement Testimony Regarding Surveillance Operations ........... 24

F. Physical Evidence.................................................... 25

G. Photographs and Maps ............................................... 26

H. Certified Records.................................................... 27

I. Admission of Past Recollections Recorded ............................... 27

J. Expert Testimony ................................................... 28

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                                          PAGE

            1.    Legal Standard ................................................................28

K.    Cross-Examination of Defendants ................................................29

L.    Agent at Counsel Table ..............................................................30

M.    Jury Nullification...........................................................................30

N.    Reciprocal Discovery and Affirmative Defenses.......................31

VI.    CONCLUSION................................................................................31

1

## <u>TABLE OF AUTHORITIES</u>

2    <u>DESCRIPTION</u>                                                             <u>PAGE</u>

3    Cases

4
5    <u>Bourjaily v. United States</u>,
      483 U.S. 171 (1987) ........................................................................18

6
7    <u>Crawford v. Washington</u>,
      541 U.S. 36 (2004) ....................................................................17, 25

8
9    <u>Gallego v. United States</u>,
      276 F.2d 914 (9th Cir. 1960) ........................................................23

10
11    <u>Ohler v. United States</u>,
      529 U.S. 753 (2000) ......................................................................26

12
13    <u>Sendejas v. United States</u>,
      428 F.2d 1040 (9th Cir. 1970) ......................................................19

14
15    <u>United States v. Arbelaez</u>,
      719 F.2d 1453 (9th Cir. 1983) ......................................................18

16
17    <u>United States v. Armstrong</u>,
      909 F.2d 1238 (9th Cir. 1990) ......................................................14

18
19    <u>United States v. Beltran-Rios</u>,
      878 F.2d 1208 (9th Cir. 1989) ......................................................26

20
21    <u>United States v. Black</u>,
      767 F.2d 1334 (9th Cir. 1985) ......................................................23

22
23    <u>United States v. Blackwood</u>,
      878 F.2d 1200 (9th Cir. 1989) ......................................................15

24
25    <u>United States v. Bridgeforth</u>,
      441 F.3d 864 (9th Cir. 2006) ........................................................18

26
27    <u>United States v. Chu Kong Yin</u>,
      935 F.2d 990 (9th Cir. 1991) ........................................................22

28    <u>United States v. Collicott</u>,

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                                          <u>PAGE</u>

 92 F.3d 973 (9th Cir. 1996) .............................................................................20

<u>United States v. Crespo de Llano</u>,
 838 F.2d 1006 (9th Cir. 1987) .......................................................................18

<u>United States v. Cuozzo</u>,
 962 F.2d 945 (9th Cir. 1992) ..........................................................................27

<u>United States v. Espinosa</u>,
 827 F.2d 604 (9th Cir. 1987) ..........................................................................26

<u>United States v. Eubanks</u>,
 591 F.2d 513 (9th Cir. 1979) ..........................................................................18

<u>United States v. Farmer</u>,
 No. 1:14CR362, 2015 WL 4661370 (N.D. Ohio Aug. 5, 2015) ...................27

<u>United States v. Freeman</u>,
 498 F.3d 893 (9th Cir. 2007) ..........................................................................20

<u>United States v. Fuentes-Montijo</u>,
 68 F.3d 352 (9th Cir. 1995) ............................................................................21

<u>United States v. Garcia</u>,
 400 F. 3d 816 (9th Cir. 2005) .........................................................................14

<u>United States v. Gil</u>,
 58 F.3d 1414 (9th Cir. 1995) ..........................................................................22

<u>United States v. Gonzalez</u>,
 319 F.3d 291 (7th Cir. 2003) ..........................................................................21

<u>United States v. Hankey</u>,
 203 F.3d 1160 (9th Cir. 2000) ........................................................................26

<u>United States v. Harrington</u>,
 923 F.2d 1371 (9th Cir. 1991) ........................................................................23

<u>United States v. Keys</u>,
 133 F.3d 1282 (9th Cir.1998) .........................................................................17

1

**TABLE OF AUTHORITIES (CONTINUED)**

2     DESCRIPTION                                                                 PAGE

3     United States v. Larson,
4        460 F.3d 1200 (9th Cir. 2006)........................................................19

5     United States v. Lizarraga-Tirado,
6        789 F.3d 1107 (9th Cir. 2015)........................................................24

7     United States v. Matta-Ballesteros,
8        71 F.3d 754 (9th Cir. 1995)...........................................................15

9     United States v. May,
10       622 F.2d 1000 (9th Cir. 1980).......................................................23

11    United States v. Mendiola,
12       707 F.3d 735 (7th Cir. 2013).........................................................16

13    United States v. Miranda-Uriarte,
14       649 F.2d 1345 (9th Cir. 1981).......................................................26

15    United States v. Mkhsian,
16       5 F.3d 1306 (9th Cir. 2003)...........................................................17

17    United States v. Moran,
18       493 F.3d 1002 (9th Cir. 2007).......................................................18

19    United States v. Nguyen,
20       230 F. App'x 686 (9th Cir. 2007)..................................................17

21    United States v. Noushfar,
22       78 F.3d 1442 (9th Cir. 1996).........................................................20

23    United States v. Noushfar,
24       140 F.3d 1244 (9th. Cir. 1998)......................................................21

25    United States v. Oaxaca,
         569 F.2d 518 (9th Cir. 1978).........................................................23

26    United States v. Orm Hieng,
27       679 F.3d 1131 (9th Cir. 2012).......................................................25

28    United States v. Ortega,

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                                     PAGE

   203 F.3d 675 (9th Cir. 2000)........................................................................19, 20

United States v. Perea-Rey,
   680 F.3d. 1179 (9th Cir. 2012)..........................................................................24

United States v. Powell,
   955 F.2d 1206 (9th Cir. 1992)...........................................................................27

United States v. Solorio,
   669 F.3d 943 (9th Cir. 2012).............................................................................22

United States v. Stearns,
   550 F.2d 1167 (9th Cir. 1977)...........................................................................23

United States v. Tolliver,
   454 F.3d 660 (7th Cir. 2006)............................................................................17

United States v. Torres,
   908 F.2d 1417 (9th Cir. 1990)...........................................................................16

United States v. Turner,
   528 F.2d 143 (9th Cir. 1975)..................................................................16, 21, 24

United States v. Vaandering,
   50 F.3d 696 (9th Cir. 1995)..............................................................................14

United States v. Valerio,
   441 F.3d 837 (9th Cir. 2006)............................................................................16

United States v. Whitman,
   771 F.2d 1348 (9th Cir. 1985)......................................................................16, 17

United States v. Williams,
   989 F.2d 1061 (9th Cir. 1993)......................................................................18, 19

United States v. Yarbrough,
   852 F.2d 1522 (9th Cir. 1988)...........................................................................18

United States v. Young,
   248 F.3d 260 (4th Cir. 2001)............................................................................28

<div align="center">**TABLE OF AUTHORITIES (CONTINUED)**</div>

DESCRIPTION                                                                                                      PAGE

United States v. Zavala-Serra,
   853 F.2d 1512 (9th Cir. 1988) .................................................................... 19

Zal v. Steppe,
   968 F.2d 924 (9th Cir. 1992) ..................................................................... 27

Statutes

21 U.S.C. § 846 ......................................................................................... 11, 12

21 U.S.C. §§ 841(a)(1) ............................................................................. 12, 13

Rules

Fed. R. Evid. 803(5) ......................................................................................... 25

Fed. R. Evid. 901(a) ......................................................................................... 15

Fed. R. Evid. 901(b)(5) .................................................................................... 16

Fed. R. Evid. 901(b)(6) .................................................................................... 16

Federal Rules of Evidence 401 ....................................................................... 27

Rule 901 ........................................................................................................... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION AND STATUS OF THE CASE

Defendants Andrew Tate, Bobby Lorenzo Reed, Willie Alsha Hill, and Frank Jones (collectively "defendants") are proceeding to trial on June 7, 2022.  Defendants Jessie Cervantes Lopez, Hector David Ortega, Lashina Lacy, Hewer Santos, and Manuel Aguilar have pled guilty.  (Dkts. 204, 209, 278, 326, 333.)

### II.   STATEMENT OF FACTS[1]

At trial, the government intends to prove beyond a reasonable doubt that defendants Andrew Tate, Bobby Lorenzo Reed, and Willie Alsha Hill distributed, possessed with intent to distribute, and conspired to distribute, methamphetamine, cocaine, and cocaine base, between approximately June 2017 and May 2018. Additionally, the government intends to prove beyond a reasonable doubt that defendant Frank Jones distributed cocaine base on August 15, 2017.

Further, the government intends to prove beyond a reasonable doubt that defendant Tate possessed with intent to distribute and conspired with others to distribute heroin in November 2017.

#### A.   Conspiracy to Distribute Drugs from H&E Shop and TNN Market

In 2017, the FBI and other law enforcement agencies began an investigation into 92-94 Hoover Criminal Gang ("HCG").[2]  Specifically, law enforcement identified two local bodegas in South Los Angeles -- the H&E Shop, operated by defendant Reed, and the TNN Market, operated by defendant Tate.

##### 1.   June 7, 2018 Distribution of Crack Cocaine

On June 7, 2017, at the FBI's direction, a confidential informant ("CI-1") walked into the H&E Shop to purchase crack cocaine.  Video recordings and surveillance

---

[1] This reflects the anticipated testimony and related exhibits the government expects to elicit in its case-in-chief.  The government reserves the right to revise the factual summary in advance of trial.

[2] The government intends to strictly limit introduction of gang evidence in its case-in-chief, as it has explained further in a pending joint motion in limine.

accounts show CI-1 enter the store and ask defendant Reed for an "eight ball" of "white."  Defendant Reed stated that the price would be $105.  While CI-1 waited for defendant Reed to obtain the purchased crack cocaine, defendant Hill (who was also inside of the H&E Shop) told CI-1 that defendant Hill would have sold CI-1 an eight ball of "fire" for $125.  Once defendant Reed returned, he provided the purchased crack cocaine to CI-1, later stating that he "put everything in [CI-1's] hand," and exchanged contact information with CI-1 for future drug sales.

Following the purchase, CI-1 met up with law enforcement and gave them the purchased crack cocaine.  The crack cocaine was forensically tested and determined to be 3.47 grams of a mixture and substance containing a detectable amount of crack cocaine.

2.   June 30, 2017 Distribution of Crack Cocaine

On June 30, 2017, CI-1 attempted to call defendant Reed, but defendant Reed did not pick up his phone.  Accordingly, as observed in video recordings and surveillance, CI-1 walked inside of the H&E Shop and greeted defendant Reed, who asked CI-1 whether he wanted "the same thing."  CI-1 responded, "get me two . . . two eight ball." When defendant Reed asked CI-1 how much defendant Reed charged CI-1, CI-1 responded, "you gave me your price . . . it was $105."  Defendant Reed can be seen and heard on his cell phone asking, "you got some hard over there?", and then telling CI-1 the total price is $220.  CI-1 handed over the cash, and defendant Reed can be seen leaving the store.  A few minutes later, defendant Reed returned to the H&E Shop and handed CI-1 two bags containing crack cocaine.

Following the purchase, CI-1 met up with law enforcement and gave them the purchased crack cocaine.  The crack cocaine was forensically tested and determined to be 4.9 grams of a mixture and substance containing a detectable amount of crack cocaine.

### 3.  July 13, 2017 Distribution of Crack Cocaine

On July 13, 2017, as observed in video recordings and surveillance, CI-1 called defendant Reed, requested "two of those white ones," and said he was on his way.

CI-1 then walked into the H&E Shop, greeted defendant Reed, and asked, "same price?"  Once CI-1 confirmed the price was $220 and handed the cash over to defendant Reed, defendant Reed provided CI-1 with crack cocaine.

Following the purchase, CI-1 met up with law enforcement and gave them the purchased crack cocaine.  The crack cocaine was forensically tested and determined to be 5.68 grams of a mixture and substance containing a detectable amount of crack cocaine.

### 4.  August 3, 2017 Distribution of Crack Cocaine

On August 3, 2017, as observed in video recordings and surveillance, CI-1 called defendant Reed to ask for "two good eight balls like you had before."  Defendant Reed responded that he was "going to see if [he] can have it together."

CI-1 then walked into the H&E Shop, which was closed, and waited for defendant Reed to arrive.  A few minutes later, defendant Reed arrived to open the store.  Inside of the H&E Shop, defendant Reed confirmed to CI-1 that it would be "the same price," and CI-1 exchanged $220 for crack cocaine.

Following the purchase, CI-1 met up with law enforcement and gave them the purchased crack cocaine.  The crack cocaine was forensically tested and determined to be 5.82 grams of a mixture and substance containing a detectable amount of crack cocaine.

### 5.  August 9, 2017 Distribution of Crack Cocaine

On August 9, 2017, CI-1 texted defendant Reed to request "two balls liked last time" and that CI-1 would arrive in 10 minutes.  Defendant Reed responded, "K."

As observed in video recordings and surveillance, CI-1 then walked into the H&E Shop and greeted defendant Reed.  Defendant Reed introduced defendant Ortega, who

1   was also inside of the H&E Shop, as defendant Reed's "business partner." CI-1
2   exchanged $220 for crack cocaine.

3   Following the purchase, CI-1 met up with law enforcement and gave them the
4   purchased crack cocaine. The crack cocaine was forensically tested and determined to
5   be 5.99 grams of a mixture and substance containing a detectable amount of crack
6   cocaine.

7   ### 6.   August 15, 2017 Distribution of Crack Cocaine

8   On August 15, 2017, as observed in video recordings and surveillance, CI-1
9   walked to the H&E Shop and saw defendant Reed sitting outside. When they entered the
10  H&E Shop, CI-1 told defendant Reed that he needed "two of those, two balls."
11  Defendant Reed placed a call on his cell phone, asking how long it would take. Toll
12  records show that defendant Reed called defendant Tate. After the call, defendant Reed
13  said that he would have to call a different supplier. After a few minutes, defendant Reed
14  placed another call, stating, "bring me two balls, hard" and "I'm at the shop." Toll
15  records show that defendant Reed called defendant Jones. When CI-1 asked whether CI-
16  1 could purchase the crack cocaine at the same price with the new supplier, defendant
17  Reed responded that whatever defendant Reed "get it at," he would pass on that price to
18  CI-1.

19  After a few minutes, defendant Jones entered the H&E Shop, and then left.
20  Defendant Reed told CI-1 that the crack cocaine was the "same ticket," meaning the
21  price was the same as previous sales, and CI-1 paid defendant Reed $220 in exchange
22  for crack cocaine.

23  Following the purchase, CI-1 met up with law enforcement and gave them the
24  purchased crack cocaine. The crack cocaine was forensically tested and determined to
25  be 6.51 grams of a mixture and substance containing a detectable amount of crack
26  cocaine.

27
28

### 7.   August 21, 2017 Distribution of Crack Cocaine

On August 21, 2017, as observed in video recordings and surveillance, CI-1 called defendant Reed and said he was on his way to the H&E Shop, and defendant Reed responded that he would check to see if his "boy" was "on deck."  Afterward, defendant Reed informed CI-1 that defendant Reed would meet CI-1 at the H&E Shop.

CI-1 entered the H&E Shop and asked defendant Reed, "same thing?"  Defendant Reed confirmed, and sold CI-1 crack cocaine in exchange for $220.  After defendant Reed sold CI-1 the crack cocaine, he told CI-1 to contact him "a day ahead of time" and defendant Reed would "already have it."

Following the purchase, CI-1 met up with law enforcement and gave them the purchased crack cocaine.  The crack cocaine was forensically tested and determined to be 6.15 grams of a mixture and substance containing a detectable amount of crack cocaine.

### 8.   September 13, 2017 Distribution of Crack Cocaine

On September 12, 2017, CI-1 tested defendant Reed, "What's up?  Stopping by at 1:00 Wednesday Need 2 -- balls," and defendant Reed responded, "K."

The next day, as observed in video recordings and surveillance, CI-1 walked into the H&E Shop and greeted defendant Reed.  Defendant Reed stated that he would "need to get [his] other phone out."  After calling someone on the phone, Defendant Reed said, "Hey, did you get that?  Did you get that [thing] I talked to you about the quarters?"  After that call, defendant Reed told CI-1 that he would need to wait, which CI-1 agreed to do.  CI-1 suggested that defendant Reed find a closer source of supply, and defendant Reed said, "hold on," and made another call before telling CI-1 it would "be about three minutes."  Defendant Reed left the H&E Shop, then after some time, returned to the store and exchanged crack cocaine for $220 from CI-1.

Following the purchase, CI-1 met up with law enforcement and gave them the purchased crack cocaine.  The crack cocaine was forensically tested and determined to

be 6.37 grams of a mixture and substance containing a detectable amount of crack cocaine.

### 9.    October 3, 2017 Distribution of Crack Cocaine and Methamphetamine

On October 3, 2017, CI-1 told defendant Reed that he needed "two."  Law enforcement then intercepted a call from defendant Reed asking defendant Tate, "Hey, you got any hard down there?" and then saying, "Give me two of them balls." Defendant Tate responded in the affirmative, and defendant Reed said, "I'm on my way to you."

As observed in video recordings and surveillance, CI-1 walked to the H&E Shop and greeted defendant Reed.  Defendant Reed told CI-1 that he "only had one" and did not know how long it would take to obtain more.  CI-1 then asked defendant Reed, "do you have any crystal" and "what does a ball of crystal go for?"  Defendant Reed responded, "like $60," and CI-1 replied that he would "take one of those."  Defendant Reed told CI-1 that the bill would be $170, and CI-1 paid defendant Reed $170 for crack cocaine and methamphetamine.  CI-1 told defendant Reed that "I can't get another ball nowhere," and defendant Reed stated that he might have another one at 3:00 p.m. Following the purchase, CI-1 met up with law enforcement and gave them the crack cocaine and methamphetamine purchased from defendant Reed.

At approximately 2:30 p.m., CI-1 called defendant Reed and asked about whether defendant Reed could sell him "that eight."  Defendant Reed responded, "let me check with my boy and see."  Later, as CI-1 was waking to the H&E Shop, defendant Reed drove next to CI-1 and exchanged crack cocaine for $130.  Following the purchase, CI-1 met up with law enforcement and gave them the purchased crack cocaine.

The crack cocaine was forensically tested and determined to be 6.80 grams of a mixture and substance containing a detectable amount of crack cocaine, and the methamphetamine was forensically tested and determined to be 3.13 grams of actual methamphetamine.

10.    <u>October 13, 2017 Distribution of Cocaine and Methamphetamine</u>

As observed in video recordings and surveillance, on October 13, 2017, CI-1 walked into the H&E Shop and greeted defendant Santos.  When CI-1 asked defendant Santos about defendant Reed's whereabouts, defendant Santos responded that defendant Reed was in the "hospital" because "he got shot."  Defendant Santos stated that he recognized CI-1 as a truck driver from a prior visit.  CI-1 asked defendant Santos for "two and two," "two eight balls" and "two of crystal."  Defendant Santos stated that he would "call Hector" since the drugs were "not here right now" and made a call. Defendant Santos then told CI-1 that defendant Ortega was "across the street."  Shortly afterward, defendant Ortega arrived, and CI-1 stated that he needed "two crystal and two crack.  Two balls of both."  Defendant Ortega stated he only had "crys" and not crack. Defendant Ortega then provided CI-1 methamphetamine in exchange for $120. Defendant Ortega also stated that he could provide "white" for $150.  Eventually, defendant Ortega agreed to sell "two" for $280.

Following the purchase, CI-1 met up with law enforcement and gave them the purchased drugs.  The drugs were forensically tested and determined to be 6.85 grams of a mixture and substance containing a detectable amount of cocaine and 6.576 grams of actual methamphetamine.

11.    <u>November 21, 2017 Distribution of Cocaine and Methamphetamine</u>

As observed in video recordings and surveillance, on November 21, 2017, CI-1 walked into the H&E Shop and greeted defendant Santos.  After defendant Santos asked what CI-1 wanted, CI-1 stated, "two eight balls" and "a half ounce of crystal." Defendant Santos stated that the "crystal" would cost $130, and the "two eight balls" would cost $280.  Defendant Santos then provided the drugs to CI-1 in exchange for $410.  After CI-1 left the H&E Shop, CI-1 called defendant Santos, stating that "you didn't give me no coke, both of these are crystal."

CI-1 then returned to the store, and defendant Santos stated defendant Ortega was heading over.  While waiting for defendant Ortega, CI-1 told defendant Santos that he

7

wanted "another half-ounce of crys." Once defendant Ortega arrived, he provided CI-1 with cocaine and methamphetamine in exchange for $130.

Following the purchase, CI-1 met up with law enforcement and gave them the purchased drugs. The drugs were forensically tested and determined to be 5.46 grams of a mixture and substance containing a detectable amount of cocaine and 27.2 grams of actual methamphetamine.

### 12.   December 12, 2017

As observed in video recordings and surveillance, on December 12, 2017, another confidential source ("CI-2") called defendant Tate and stated that he was on his way over to get a "sixty piece." Defendant Tate responded that he was in the "Yard." CI-2 headed over to the Yard, which was near the TNN Market, greeted defendant Tate, and asked, "can I get $80 of crack?" Defendant Tate then obtained crack cocaine from his car and gave it to CI-2 in exchange for $80.

Following the purchase, CI-2 met up with law enforcement and gave them the purchased drugs. The drugs were forensically tested and determined to be 1.98 grams of a mixture and substance containing a detectable amount of crack cocaine.

### 13.   January 16, 2018 Distribution of Crack Cocaine and Methamphetamine

As observed in video recordings and surveillance, on January 16, 2018, CI-2 walked over to the "Yard" and greeted defendants Aguilar and Tate. After CI-2 told defendant Aguilar that CI-2 wanted "two eighths" of "rock," defendant Aguilar then lead CI-2 to defendant Tate, who told CI-2 that two eight balls was "$240." Defendant Tate then instructed defendant Aguilar where to find the drugs and a scale in a nearby car. Defendant Aguilar then provided the drugs to CI-2 in exchange for $240. When CI-2 asked defendant Aguilar for methamphetamine, defendant Aguilar instructed CI-2 to go to the H&E Shop to buy it and to say that "Manny" sent CI-2 over there. CI-2 then walked over to the H&E Shop and saw defendant Santos. CI-2 told defendant Santos

8

that he wanted 40 of crystal and that he knew "Batman."  Defendant Santos gave methamphetamine to CI-2 in exchange for $50.

Following the purchase, CI-2 met up with law enforcement and gave them the purchased drugs.  The drugs were forensically tested and determined to be 6.36 grams of a mixture and substance containing a detectable amount of crack cocaine and 2.89 grams of actual methamphetamine.

### 14.  February 1, 2018 Distribution of Crack Cocaine and Methamphetamine

As observed in video recordings and surveillance, on February 1, 2018, CI-2 went to the "Yard" and greeted defendant Tate.  CI-2 said, "I need two eight ball, dude.  You say $240, right?"  Defendant Tate nodded and provided drugs to CI-2 in exchange for $240.  After CI-2 asked to purchase more drugs, defendant Tate directed CI-2 to defendant Aguilar, who told CI-2 to go to "the other store" and say "Manny" sent you.  CI-2 then went to the H&E Shop, where he obtained more drugs from defendant Santos in exchange for $440.

Following the purchase, CI-2 met up with law enforcement and gave them the purchased drugs.  The drugs were forensically tested and determined to be 6.5 grams of a mixture and substance containing a detectable amount of crack cocaine and 23.4 grams of actual methamphetamine.

### 15.  March 2, 2018 Distribution of Crack Cocaine and Methamphetamine

As observed in video recordings and surveillance, CI-2 called defendant Tate, who instructed CI-2 to go to the "Yard."  When CI-2 went to the "Yard," no one was outside.  CI-2 then walked to H&E Shop and saw defendant Santos.  CI-2 then purchased four eights of "crystal" for $200.  CI-2 then walked over to the TNN Store, saw defendant Aguilar, and, after referencing defendant Tate, asked for "two or three eighths."  Defendant Aguilar told CI-2 that "It'll be $110 for a 3.5," and CI-2 said, "give me four."  Defendant Aguilar then gave CI-2 drugs in exchange for $440.

Following the purchase, CI-2 met up with law enforcement and gave them the purchased drugs.  The drugs were forensically tested and determined to be 12.7 grams of a mixture and substance containing a detectable amount of crack cocaine and 12.57 grams of actual methamphetamine.

16.   May 3, 2018 Distribution of Crack Cocaine and Methamphetamine

As observed in video recordings and surveillance, on May 3, 2018, CI-2 went to the H&E Shop and greeted defendant Santos.  Defendant Santos stated that he had "sixteen" selling for $25, and CI-2 requested "eight."  Defendant Santos then provided drugs to CI-2 in exchange for $200.

CI-2 then walked to the TNN Store, saw defendant Aguilar, and asked for "two eights."  When defendant Aguilar asked CI-2 whether he had talked to defendant Tate, CI-2 stated that the phone did not work.  Defendant Aguilar then picked up his phone to call "Batman."  Defendant Tate confirmed, "Yeah, that's him."  Defendant Aguilar then provided CI-2 the drugs in exchange for $280.

Following the purchase, CI-2 met up with law enforcement and gave them the purchased drugs.  The drugs were forensically tested and determined to be 6.47 grams of a mixture and substance containing a detectable amount of crack cocaine and 10.84 grams of actual methamphetamine.

17.   May 22, 2018 Distribution of Methamphetamine

As observed in video recordings and surveillance, on May 22, 2018, CI-2 walked into the H&E Shop.  In Spanish, CI-2 asked defendant Santos for four eighths, and defendant Santos stated it would cost $220.  CI-2 then asked for another half.  During the exchange, defendant Santos stated defendant Tate was "incarcerated right now."  Defendant Santos then provided CI-2 with drugs in exchange for $440.

Following the purchase, CI-2 met up with law enforcement and gave them the purchased drugs.  The drugs were forensically tested and determined to be 28 grams of actual methamphetamine.

1          18.  <u>Title III Wiretap Interceptions</u>

2       During part of the charged time period of the conspiracy charged in count one, law

3  enforcement also intercepted calls using Title III wiretaps by and/or between defendants

4  Tate, Reed, Hill, Lopez, Vidal, and other defendants who will not be proceeding to trial

5  on February 8, 2022.  During these intercepted communications, these defendants

6  discussed with one another procuring and selling methamphetamine, crack cocaine, and

7  cocaine, using coded language, such as "white," "hard," "soft," "eight ball," "3.5s,"

8  "crystal," "onion," and "window."

9  **B.  Conspiracy to Smuggle Heroin into Solano State Prison**

10       On November 6, 2017, during an intercepted call, defendant Tate spoke with

11  Randolph Hawkins, an inmate at Solano State Prison.  Using coded language, defendant

12  Tate discussed sending heroin ("black") to Hawkins in prison, and stated, "I think the

13  bitch going to come up here the 18th or the 19th."  The next day, on November 7, 2017,

14  using coded language, defendant Tate and Hawkins discussed how a woman would

15  smuggle the drugs on her person to Hawkins in prison, and defendant Tate instructed

16  Hawkins to contact him on his "hot phone."  On November 12, 2017, Hawkins texted

17  defendant Tate, "Her # 626 620-1684.  Lashina."  That same day, on an intercepted call,

18  defendant Tate spoke to defendant Lacy and coordinated a delivery of heroin to

19  defendant Lacy.  Following the handoff, defendant Tate called Hawkins, stating that "she

20  came in and got it. . . it's four black" and that it's worth "three, four thousand right

21  there."

22       On November 18, 2017, law enforcement stopped defendant Lacy at the entrance

23  to Solano State Prison.  During an interview, defendant Lacy admitted to possessing

24  drugs and handed law enforcement a bindle of drugs hidden on her person.  The drugs

25  were forensically tested and determined to be 4.14 grams of a mixture and substance

26  containing a detectable amount of heroin.

27

28

III.   **CHARGED STATUES AND ELEMENTS**

    A.   **Conspiracy and Distribution**

For defendants Tate, Reed, and Hill to be guilty of violating 21 U.S.C. § 846, conspiracy to distribute and possess with intent to distribute controlled substances, as charged in Count One of the indictment, the government must prove:   (1) beginning on an unknown date, and continuing to on or about May 22, 2018, there was an agreement between two or more persons to distribute or possess with intent to distribute controlled substances; and (2) the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.  See Ninth Cir. Model Criminal Jury Instructions, No. 12.3 (2022 ed.).  To be subject to the ten-year mandatory minimum sentence under the statute, the government must prove the defendant either personally agreed to, or encouraged, transactions involving at least 50 grams of methamphetamine, or reasonably could have foreseen that the conspiracy involved at least 50 grams of methamphetamine.  To be subject to the five-year mandatory minimum sentence under the statute, the government must prove that the defendant either personally agreed to, or encouraged, transactions involving at least 5 grams of methamphetamine or at least 28 grams of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, or reasonably could have foreseen that the conspiracy involved at least 5 grams of methamphetamine or at least 28 grams of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine.

For defendant Tate to be guilty of violating 21 U.S.C. § 846, conspiracy to distribute and possess with intent to distribute heroin, as charged in Count Twenty-Eight of the Indictment, the government must prove:  (1) beginning on an unknown date, and continuing to on or about November 18, 2017, there was an agreement between two or more persons to distribute or possess with intent to distribute controlled substances; and (2) the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.  See Ninth Cir. Model Criminal Jury Instructions, No. 12.3 (2022 ed.).

For defendant Tate to be guilty of violating 21 U.S.C. §§ 841(a)(1), (b)(1)(B), as charged in Counts Eight, Fifteen, Seventeen, Twenty-Two, Twenty-Three, Twenty-Five, and Twenty-Seven of the Indictment, the government must prove:  (1) the defendant knowingly distributed or possessed with intent to distribute methamphetamine, cocaine base in the form of crack cocaine, or cocaine, and (2) the defendant knew that it was methamphetamine, cocaine base in the form of crack cocaine, cocaine, or some other prohibited drug.  <u>See</u> Ninth Circuit Model Criminal Jury Instructions, No. 12.1 (2022 ed.).  To be subject to the five-year mandatory minimum sentence under the statute, the government must prove that the controlled substances at issue for the count involved at least 5 grams of methamphetamine.

For defendants Reed, Tate, and Jones to be guilty of violating 21 U.S.C. §§ 841(a)(1), (b)(1)(C), distribution and possession with intent to distribute controlled substances, as charged in Counts Two though Seven, Nine through Fourteen, Sixteen, Eighteen through Twenty-One, Twenty-Four, Twenty-Six, and Twenty-Nine of the Indictment, the government must prove:  (1) the defendant knowingly distributed or possessed with intent to distribute methamphetamine, cocaine base in the form of crack cocaine, or cocaine, and (2) the defendant knew that it was methamphetamine, cocaine base in the form of crack cocaine, cocaine, or some other prohibited drug.  <u>See</u> Ninth Circuit Model Criminal Jury Instructions, No. 12.1 (2022 ed.).

"Distributing" means delivering or transferring possession to another person, with or without any financial interest in that transaction.  <u>See</u> Ninth Circuit Model Criminal Jury Instructions, No. 12.1 (2022 ed.).

## B.    Aiding and Abetting

Additionally, the theory of aiding and abetting supplies another basis for criminal liability for defendants.  To prove defendants' guilt of distribution of controlled substances by aiding and abetting, the government must prove each of the following beyond a reasonable doubt:

(1) the crime of distribution of controlled substances was committed by someone;

13

(2) the defendant aided, counseled, commanded, induced or procured that person with respect to at least one element of distribution of controlled substances;

(3) defendant acted with the intent to facilitate distribution of controlled substances; and

(4) the defendant acted before the crime was complete.

See Ninth Circuit Model Criminal Jury Instructions, No. 4.1 (2022 ed.)

The theory of aiding and abetting is embedded in every federal indictment for a substantive crime.  See e.g., United States v. Armstrong, 909 F.2d 1238, 1241-1242 (9th Cir. 1990) ("Aiding and abetting is implied in every federal indictment for a substantive offense[,]" even though the elements necessary to convict as a principal and as an aider and abettor are different); United States v. Vaandering, 50 F.3d 696, 702 (9th Cir. 1995) (holding that a general aiding and abetting instruction need not be tied to a specific count of an indictment).  The jury's verdict need not be unanimous with respect to the theory underlying conviction.  See United States v. Garcia, 400 F. 3d 816, 820 (9th Cir. 2005) (holding that liability as a principal attaches whether a defendant commits an act himself or aids and abets another who committed the act); Ninth Circuit Model Criminal Jury Instructions, No. 4.1 (2022 ed.)  ("The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.")

## IV.	TIME ESTIMATE

The estimated time for the government's case-in-chief is approximately ten days. The government anticipates calling approximately twenty-five witnesses.  These witnesses include law enforcement officers who coordinated and participated in this investigation, as well as experts ranging from a translator to forensic chemists.

The government has extended proposed stipulations to defendants regarding the Spanish language transcripts and drug type and weight at issue to streamline the trial but, to date, no defendant has agreed to either stipulation.

The government reserves the right to modify this list and call additional witnesses, and may also call additional witnesses if a rebuttal case is necessary.

## V.    LEGAL AND EVIDENTIARY ISSUES

The government will not exhaustively recite every legal issue in this case below because the parties will file pretrial motions on certain issues.  For example, the parties intend to file motions <u>in limine</u> on the following issues:  (1) the admission of certain information regarding law enforcement witnesses and persons; (2) the admission of prior convictions of certain defendants if they testify at trial under Federal Rule of Evidence ("Rule") 609(a); (3) the admission of certain defendant's post-arrest statements under Rule 801(d)(2)(A); (4) references to gangs, guns, monikers, and other gang evidence; (5) certain specific factual issues regarding various defendants' arrests and periods of incarceration that are referenced in recordings with the confidential informants; (6) the admission of wiretap evidence; and (8) the admission of co-conspirator statements under Rule 801(d)(2)(E).

The Court provided tentative rulings on these motions <u>in limine</u> at the January 24, 2022 pretrial conference, but ordered the parties to meet and confer regarding some of the following issues in advance of the upcoming pretrial conference.

### A.    Transcripts of Recordings

At the January 24, 2022 pretrial conference, the Court ordered the government to provide any transcripts for any recordings it intends to introduce at trial by February 24, 2022 and the defendants to file any objections to the transcripts by March 31, 2022.[3] The government and defense counsel met these deadlines, met-and-conferred about minor disputes, and no objections were filed.

When an audio recording is in a foreign language, such as Spanish, the transcripts of the English translation are the evidence rather than the recordings.  <u>United States v. Fuentes-Montijo</u>, 68 F.3d 352, 354-56 (9th Cir. 1995) (upholding jury instruction that

---

[3] At the January 24, 2022 pretrial conference, the government requested, and the Court acknowledged, that it may provide a limited number of additional transcripts of additional recordings to defense counsel after February 24, 2022 as the government further refines its case for trial.  The parties agreed to meet and confer regarding these additional transcripts before raising any disputes before the Court.

transcript of English translation of Spanish recording was the evidence).  The foundational requirements for the admission of English-language transcripts of foreign language recordings are left to the discretion of the trial judge.  United States v. Turner, 528 F.2d 143, 168 (9th Cir. 1975).  A translation is sufficiently accurate if it reasonably conveys the intent or the idea of the thought spoken.  United States v. Gonzalez, 319 F.3d 291, 296 (7th Cir. 2003) (internal quotation marks omitted).  The jury is not free to reject the accuracy of the interpretation of the foreign language recordings.  Fuentes-Montijo, 68 F.3d at 352.

As no objections were filed to the government's final transcripts, the government sent defense counsel a proposed stipulation to the accuracy of the English-language transcripts of foreign language recordings to streamline the trial.  To date, no defendant has agreed to the proposed stipulation.

## B.  Defendants' Nicknames and Other Alleged "Gang" Evidence

Defendant Tate moved in limine to exclude alleged gang evidence, including any nicknames.  At the January 24, 2022 pretrial conference, the government agreed not to introduce evidence of gang affiliation to the Hoovers in its case-in-chief unless defendants opened the door, such as arguing that law enforcement had an impermissible motive in investigating any defendants or the two smoke shops.  However, in any event, the government argued that evidence of nicknames -- which the government does not believe is gang evidence -- is necessary to prove identity, as nicknames were used during some of the intercepted calls.[4]  The Court ordered the parties to meet-and-confer regarding a possible resolution prior to issuing its final ruling.

Following the January 24, 2022 and negotiation with defense counsel, the government extended stipulations by which defendants would agree that they were also

---

[4] Defendant Tate was known by the nicknames, "Batman," "Bat," and "Big Dog." Defendant Reed was known by the nicknames, "Z" and Zo."  Defendant Hill was known by the nicknames, "Keith," "Big Smoke," "Smoke," and "Smeezy."

16

1 known by their nicknames.  To date, however, no defendant has signed the proposed
2 stipulations offered by the government.

3    In addition, although gun evidence is also not necessarily "gang" evidence, the
4 government agrees not to introduce evidence of the gun allegedly possessed by
5 defendant Tate on August 13, 2017, which is the subject of the dismissed Count Thirty-
6 One.  To the extent that defendants used coded language to discuss hiding drugs with
7 guns in intercepted calls, however, such as during the following call on December 24,
8 2017:

9
- AGUILAR: Hey Bat.
10
- TATE: Where'd you put the dope at Shag?
11
- AGUILAR: Uh right there on the bumper.
- TATE: Huh?
12
- AGUILAR: The bumper.
13
- TATE: I'm looking on the bumper, I can't find it.
14
- AGUILAR: It's right there, you know, as soon as you put your hand in, right in the middle.  You know where the [UI] ring goes for the tow hitch? It's right there.
15
16
- TATE: I don't…I feel the gun, that's it.
- AGUILAR: Huh?
17
- TATE: All I feel is the gun.
18
- AGUILAR: No as soon as, ok, when you put your hand in the bumper [UI] right through, right away. It's not on all the way back, it's like more towards, more towards the end.  You found it?
19
20
- TATE: Nope.
21
- AGUILAR: I put it right there. Cause when you go back there, when you're walking like [UI] where the curve's at, you put your hand and it's right there. Like right in the corner. You put your hand in. It's not all the way in in, just like right right there. After you put your hand in you should feel the plastic.
22
23
24
- TATE: Only thing I see is the gun. Oh I see. I see it, I got it. It's on top of the gun.
25
- AGUILAR: Huh?
26
- TATE: It's on top of the gun.
27
- AGUILAR: Yeah yeah. Cause I put the gun, and then I put that on right there, as soon as you put your hand in, you should feel it.
28

such intercepted communications using coded language to refer to drugs hidden in a car's bumper next to a gun is direct evidence of the conspiracy charged in Count One, proof that "dope" is coded language for drugs, as "dope" was hidden near a weapon that a jury can reasonably infer was placed there to protect the drugs, and evidence of defendant Tate's role in the conspiracy and relationship to defendant Aguilar, among other permissible purposes.

### C.    Defendant Tate's Incarceration and Defendant Reed's Shooting

Defendant Tate moved <u>in limine</u> to exclude references to his prior incarceration and defendant Reed's shooting on October 7, 2017.  In particular, on October 13, 2017, defendant Santos told a confidential informant that defendant Reed was not in the store because he was shot in a gang-related incident and was in the hospital.  Likewise, on May 22, 2018, defendant Santos told a confidential information that defendant Tate was not in the store because he was "in prison" because police "found a gun on the dude."  At the January 24, 2022 pretrial conference, the government explained that the evidence of those incidents disproved any potential argument by defendants Tate or Reed that their prematurely withdrew from the conspiracy or otherwise lacked control over the drugs sold in their respective stores.  The Court ordered the parties to meet-and-confer about these issues in advance of the upcoming pretrial conference before the Court issued its final ruling.

The government proposed to counsel for defendants Tate and Reed that the government would agree not to introduce evidence of defendant Tate's gun possession and time in prison or defendant Reed's shooting if defense counsel for defendants Tate and Reed represented and agreed not opened the door in cross-examination or argument. To date, neither defense counsel has agreed to the government's proposal.

### D.    Recorded Statements by Defendants

At trial, the government intends to introduce recorded statements made by defendants made during:  (1) calls intercepted by law enforcement using Title III

18

1  wiretaps, (2) audio and video recorded communications and interactions with CIs, (3)

2  recorded jail calls, and (4) recorded and Mirandized post-arrest interviews.

3            1.    Foundation

4        The foundation that must be laid for the introduction into evidence of such

5  recordings is a matter largely within the discretion of the trial court.  There is no rigid set

6  of foundational requirements.  The Ninth Circuit held that recordings

7      are sufficiently authenticated under Fed. R. Evid. 901(a) if "sufficient proof
    has been introduced so that a reasonable juror could find in favor of

8      authenticity or identification."  [Citing cases.]  This is done by proving a
    connection between the evidence and the party against whom the evidence is

9      admitted, and can be done by both direct and circumstantial evidence.

10  United States v. Matta-Ballesteros, 71 F.3d 754, 768 (9th Cir. 1995), modified, 98 F.3d

11  1100 (9th Cir. 1996).  Indeed, Rule 901 requires only that the United States make "a

12  prima facie showing of authenticity so that a reasonable juror could find in favor of

13  authenticity or identification," and the "probative force of the evidence offered is,

14  ultimately, an issue for the jury."  United States v. Blackwood, 878 F.2d 1200, 1202 (9th

15  Cir. 1989) (citations omitted).

16        There are many different types of evidence that can establish voice authenticity.

17  For example, testimony of voice recognition constitutes sufficient authentication for

18  recordings.  Fed. R. Evid. 901(b)(5); United States v. Torres, 908 F.2d 1417, 1425 (9th

19  Cir. 1990) (holding that testimony by law enforcement that he spoke to the defendant

20  and recognized her voice on the recordings was sufficient to authenticate the recordings);

21  United States v. Mendiola, 707 F.3d 735, 740 (7th Cir. 2013) ("The bar for familiarity is

22  not a high one.  This court has held that hearing a defendant's voice once during a court

23  proceeding satisfies the minimal familiarity requirement").  So does circumstantial

24  evidence that tends to show the defendant as the speaker.  See, e.g., Fed. R. Evid.

25  901(b)(6); United States v. Turner, 528 F.2d 143, 163 (9th Cir. 1975) (holding that the

26  speaker's identity on a recording also can be established by circumstantial facts,

27  including identification by name, prior to admission).

28

1

2.      <u>Defendants' Statements Are Admissible Under Rule 801(d)(2)(A)</u>
<u>Only When Offered by the Government</u>

At trial, defendants' statements in these recordings are admissible as admissions by a party opponent and are not hearsay when offered by the government.  Rule 801(d)(2)(A).

Defendants' statements that are captured during audio and video recorded interactions with CIs and wiretap calls also contain statements from CIs and other parties.  Statements from the CIs and other parties on the recordings are also admissible because they are not offered for the truth of the matter asserted; they are instead offered to demonstrate the effect on the listener – defendants – to provide context for defendants' statements and actions.  In <u>United States v. Whitman</u>, 771 F.2d 1348 (9th Cir. 1985), the Ninth Circuit upheld a district court's admission of an informant's statements to a defendant that were contained on a recording of a conversation between defendant and the informant because "the court did not admit the informant's statements for their truth but only to show that they were made."  <u>Id.</u> at 1352.  The informant's statements, the court explained, "were not admitted for their truth but to enable the jury to understand [the] taped statements, and the jury was so instructed."  <u>See also</u> <u>United States v. Valerio</u>, 441 F.3d 837, 844 (9th Cir. 2006) (informant's statements on a recording are admissible to give context to defendant's statements "so that the jury could understand what Valerio was responding to when he spoke"); <u>United States v. Nguyen</u>, 230 F. App'x 686, 690 (9th Cir. 2007) ("[T]he district court did not err in admitting out-of-court statements of the informant, which were translated and transcribed for the jury. The statements were properly admitted for the non-hearsay purpose of providing context for [defendant's] recorded statements, and not for truth.").[5]

Admission of these contextual statements do not violate a defendant's confrontation rights.  In <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), the Supreme

---

[5] The Court may give a limiting instruction prior to the playing of recordings instructing the jury that a CI's statements are not offered for the truth but for context. <u>See</u> <u>Whitman</u>, 771 F.2d at 1352.

20

Court held that, when the government offers at trial hearsay evidence in a criminal case that is "testimonial" in nature, the Confrontation Clause of the Sixth Amendment requires actual confrontation, i.e., cross-examination.  But this "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  Id. at 57, n.9.  "Statements providing context for other admissible statements are not hearsay because they are not offered for their truth.  As a result, the admission of such context evidence does not offend the Confrontation Clause because the declarant is not a witness against the accused."  United States v. Tolliver, 454 F.3d 660, 666 (7th Cir. 2006) (internal citations omitted).

3.    Defendants' Statements Are Admissible Under Rule 801(d)(2)(E) Only When Offered by the Government

At trial, defendants' statements in these recordings are further admissible when offered by the government because they are co-conspirator statements under Rule 801(d)(2)(E).  See United States v. Mkhsian, 5 F.3d 1306, 1312 (9th Cir. 2003) ("It is well-established in this and other circuits that the statements of co-conspirators are not hearsay even if made prior to the entry of the conspiracy by the party against whom they are used") (cleaned up), overruled on other grounds by United States v. Keys, 133 F.3d 1282, 1287 (9th Cir.1998) (en banc).

To admit a co-conspirator statement, the government must prove by a preponderance of the evidence that a statement is a co-conspirator declaration, namely, that: (1) the declaration was made during the life of the conspiracy; (2) it was made in furtherance of the conspiracy; and (3) there is, including the co-conspirator's declaration itself, sufficient proof of the existence of the conspiracy and of the defendant's connection to it.  See Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Crespo de Llano, 838 F.2d 1006, 1017 (9th Cir. 1987) ("Once a conspiracy is shown, the prosecution need only present slight evidence connecting the defendant to the

conspiracy.").[6] The term "in furtherance of the conspiracy" is construed broadly to include statements made to "induce enlistment or further participation in the group's activities," to "prompt further action on the part of conspirators," to "reassure members of a conspiracy's continued existence," to "allay a co-conspirator's fears," and to "keep co-conspirators abreast of an ongoing conspiracy's activities." United States v. Yarbrough, 852 F.2d 1522, 1535-1536 (9th Cir. 1988); see also United States v. Moran, 493 F.3d 1002, 1010 (9th Cir. 2007) ("[S]tatements made to keep coconspirators abreast of an ongoing conspiracy's activities satisfy the 'in furtherance' of requirement"); United States v. Bridgeforth, 441 F.3d 864, 869 (9th Cir. 2006) (statements furthered conspiracy because they were "designated to facilitate [coconspirators'] purchase of drugs"); United States v. Eubanks, 591 F.2d 513, 520 (9th Cir. 1979) (statements that "set in motion transactions that were an integral part of the [drug] distribution scheme" furthered conspiracy). Statements made with the intent of furthering the conspiracy are admissible whether or not they actually result in any benefit to the conspiracy. See United States v. Williams, 989 F.2d 1061, 1068 (9th Cir. 1993) ("the court looks to the declarant's intent in making the statement, not the actual effect of the statement"). Likewise, it is not necessary that the defendant be present at the time the statement was made. Sendejas v. United States, 428 F.2d 1040, 1045 (9th Cir. 1970). It is not necessary that the statement be made to another member of the conspiracy for it to come under the Rule, including informants and undercover agents. Williams, 989 F.2d at 1068; United States v. Zavala-Serra, 853 F.2d 1512, 1516 (9th Cir. 1988) (statements to undercover agents are admissible under Rule 801(d)(2)(E)).

Like statements by a party opponent under Rule 801(d)(2)(A), statements made in furtherance of a conspiracy by their nature are "not testimonial," and their admission

---

[6] The foundation for the admission of a co-conspirator statement may be established before or after the admission of the statement. If a proper foundation has not yet been laid, the court may nevertheless admit the statement, but with an admonition that the testimony will be stricken should the conspiracy not be proven. United States v. Arbelaez, 719 F.2d 1453, 1460 (9th Cir. 1983). Further, for English-only recordings, the recording itself is the evidence – and not the transcripts.

1    does not violate the Confrontation Clause.  <u>Crawford</u>, 541 at 56; <u>United States v. Larson</u>,
2    460 F.3d 1200, 1213 (9th Cir. 2006).

3            4.      <u>Defendants' Statements Are Inadmissible When Offered by</u>
4                    <u>Defendants Under Rules 801(d)(2)(A) and (d)(2)(E)</u>

5        Because of the volume of intercepted calls and recorded interactions, including
6    many that are either cumulative or irrelevant to the immediate issues at trial, the
7    government will only be introducing a subset of the recordings, some of which will be
8    excerpts.  This decision itself follows from the mandate of Rule 403 excluding even
9    relevant evidence that presents a danger of "undue delay, wasting time, or needlessly
10   presenting cumulative evidence."  Rule 403.

11       Regardless, defendants may not seek to introduce their own recorded statements at
12   trial under Rule 801(d)(2)(A).  Defendants' statements are admissible only if offered
13   against them -- otherwise, they fall within the scope of the rule against hearsay.  <u>See</u>
14   <u>United States v. Ortega</u>, 203 F.3d 675, 682 (9th Cir. 2000) (non-self-inculpatory
15   statements, even if made contemporaneously with other self-inculpatory statements, are
16   inadmissible hearsay).  To permit otherwise would place a defendant's statements
17   "before the jury without subjecting himself to cross-examination, precisely what the
18   hearsay rule forbids."  <u>Ortega</u>, 203 F.3d at 682 (district court properly granted the
19   government's motion <u>in limine</u> to exclude introducing defendant's post-arrest statements
20   through cross-examination of government agent).

21       In addition, by the very terms of the Rule, a defendant cannot attempt to introduce
22   exculpatory statements made by his co-conspirators under Rule 801(d)(2)(E).

23       Likewise, the rule of completeness also does not entitle a defendant to elicit his
24   own inadmissible hearsay statements.  <u>Ortega</u>, 203 F.3d at 682 ("Even if the rule of
25   completeness did apply, exclusion of Ortega's exculpatory statements was proper
26   because these statements would still have constituted inadmissible hearsay"); <u>United</u>
27   <u>States v. Collicott</u>, 92 F.3d 973, 983 (9th Cir. 1996) (holding that Rule 106 does not
28   compel admission of otherwise inadmissible hearsay evidence).  Thus, if the government

23

plays only a portion of any recordings in this case, the defendants have no automatic right to introduce the remainder of the recording for their own benefit.

### 5.   Lay Interpretation

The government may seek to elicit lay testimony from the case agents regarding the meaning of certain intercepted communications, based on their knowledge of the investigation.  Lay opinion testimony is admissible if it is (1) "rationally based on the perception of the witness," (2) "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue[,]" and (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Rule 701; see also United States v. Freeman, 498 F.3d 893, 904-05 (9th Cir. 2007) (upholding, as proper lay testimony, detective's testimony interpreting ambiguous statements where his "understanding of ambiguous phrases was based on his direct perception of several hours of intercepted conversations . . . and other facts he learned during the investigation" and his testimony "proved helpful to the jury in determining what [defendants] were communicating during the recorded telephone calls").

### 6.   Recordings Must be Played in Open Court

All duly admitted recorded conversations must be played in open court.  Allowing jurors to take into the jury deliberation room recorded conversations that were not played in open court is structural error requiring automatic reversal if a defendant objects to allowing the jurors to have the unplayed calls in the jury room.  United States v. Noushfar, 78 F.3d 1442, 1444-46 (9th Cir. 1996), as amended, 140 F.3d 1244 (9th. Cir. 1998).  Accordingly, if the jury wishes to hear playback of a recording during deliberations, then such playback must occur in open court with all parties present and the entire requested recording must be played back.

### E.   Law Enforcement Testimony Regarding Surveillance Operations

The government expects to offer the testimony of several law enforcement surveillance officers who conducted surveillance of the meeting between the CIs and the defendants for reasons that included the need to continuously monitor the CI to ensure

the CI's safety.  Some may relay information they received over police radio or telephonically from other surveillance officers.  Reported observations made by surveillance officers are admissible as present sense impression under Rule 803(1).  United States v. Gil, 58 F.3d 1414, 1422 (9th Cir. 1995) (affirming admission of testimony of "note-takers" who testified as to observations reported by other surveillance officers); United States v. Solorio, 669 F.3d 943, 952 n.11 (9th Cir. 2012).

Moreover, the government's use of present sense impressions at trial does not violate defendant's confrontation rights under the Sixth Amendment if the "primary purpose" of the statements is to "focus[] the surveilling agents' attention on reporting the unfolding events to others working with them," rather than to create a record for trial.  Solorio, 669 F.3d at 953-954 (upholding admission of testimony regarding surveillance observations made during drug deal because "objectively assessed, the 'primary purpose' of the agents' statements was assuring that the arrest effort both succeeded and did not escalate into a dangerous situation, not 'to create a record for trial.'")

### F.    Physical Evidence

The government may seek to introduce the crack cocaine, methamphetamine, cocaine, and heroin that were seized during this investigation.[7]  Rule 901(a) provides that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Rule 901(a) only requires the government to make a prima facie showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification."  United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991).  Once the government meets this burden, "the

---

[7] Although the drugs may be admitted into evidence as exhibits, that evidence is not sent back to the jury room for safety reasons.  This is to the protect the jury from mishandling the contraband and accidentally harming themselves.  The contraband and other evidence which is admitted but not sent back to the deliberation room, like the recordings, will remain in the courtroom until such time, if any, the jury requests to inspect the item in the presence of the Court.  Law enforcement will maintain control of the drugs throughout the proceedings and will secure it back into evidence when the proceedings conclude.

1  credibility or probative force of the evidence offered is, ultimately, an issue for the jury."
2  United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985).

3      To be admitted into evidence, a physical exhibit must be in substantially the same
4  condition as when the crime was committed.  Rule 901.  The Court may admit the
5  evidence if there is a "reasonable probability the article has not been changed in
6  important respects."  United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991).
7  Factors the Court may consider in making this determination include the nature of the
8  item, the circumstances surrounding its preservation, and the likelihood of intermeddlers
9  having tampered with it.  Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1960).

10     In establishing chain of custody as to an item of physical evidence, the
11 government is not required to call all persons who may have come into contact with the
12 piece of evidence.  Harrington, 923 F.2d at 1374.  Moreover, a presumption of regularity
13 exists in the handling of exhibits by public officials.  Id.  Therefore, to the extent that
14 alleged or actual gaps in the chain of custody exist, such gaps go to the weight of the
15 evidence rather than to its admissibility.  Id.  In the absence of evidence of tampering,
16 there is a presumption that public officers have properly discharged their official duties.
17 Id.

18     **G.    Photographs and Maps**

19     The United States intends to introduce photographs of the various individuals and
20 locations relevant to the case, as well as some of the items that were seized during the
21 investigation.  Photographs are generally admissible as evidence.  See United States v.
22 Stearns, 550 F.2d 1167, 1170-71 (9th Cir. 1977).  Photographs should be admitted so
23 long as they fairly and accurately represent the event or object in question.  United States
24 v. Oaxaca, 569 F.2d 518, 525 (9th Cir. 1978).  The Ninth Circuit has held that
25 "[p]hotographs are admissible as substantive as well as illustrative evidence."  United
26 States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980).

27     The government also intends to display maps obtained from Google Earth / Maps
28 as demonstratives to aid the jury in understanding where and how the charged

transactions occurred.  The maps will be authenticated by law enforcement officers who were percipient witnesses as to the area the maps depict as they were present in the depicted area surveilling the transaction when it occurred.

The admission of demonstrative evidence such as maps that assists the understanding of the trier of fact is a matter committed to the sound discretion of the trial court.  United States v. Turner, 528 F.2d 143, 167-68 (9th Cir. 1975).  The Court may properly admit maps from Google Earth because they are not hearsay, especially when a witness familiar with the area testifies about them.  United States v. Lizarraga-Tirado, 789 F.3d 1107, 1109 (9th Cir. 2015).  The Court may also take judicial notice of maps, including on-line maps and satellite images.  See United States v. Perea-Rey, 680 F.3d 1179, n.11 (9th Cir. 2012).[8]

## H.     Certified Records

The government intends to introduce certified public records from the Department of Motor Vehicles, including photographs of defendants.  Public records, reports, statements, or data compilations of public offices or agencies setting forth the activities of the office or agency, or matters observed pursuant to duty imposed by law as to which matters there was a duty to report are admissible as an exception to the hearsay rule.  Rule 803(8).  Moreover, certified copies of public records are self-authenticating and do not require extrinsic evidence of authenticity as a condition precedent to admissibility.  Rule 902(1), (4).

## I.     Admission of Past Recollections Recorded

To the extent that any government witness's memory does not fully capture the events relevant to the instant charge, the government may seek to refresh the witness's

---

[8] Under Federal Rule of Evidence 902, certain items of evidence are self-authenticating.  Federal Rule of Evidence 902(5) (Official Publications) covers "[a] book, pamphlet, or other publication purporting to be issued by a public authority."  The United States Geological Survey maintains a United States National Map at website address http://viewer.nationalmap.gov/viewer/.  Maps from this website are self-authenticating.  The maps from this website can be used to verify the accuracy of the maps the government is offering.

present recollection using his past recollections recorded and made or adopted when the information was fresh in the witness's memory. To the extent that a witness's prior written statements do not in fact refresh his recollection, the government may seek to have such statements read into evidence as recorded recollections, pursuant to Federal Rule of Evidence 803(5). See, e.g., United States v. Orm Hieng, 679 F.3d 1131, 1143 (9th Cir. 2012) (holding that a report prepared by a detective who testified that it accurately reflected his knowledge and was made when it was fresh in his mind fell "comfortably within the exception for recorded recollections" pursuant to Fed. R. Evid. 803(5)). Since the authors of any such statements will be available for cross-examination by the defense, their admission will not violate defendant's confrontation rights under Crawford. Crawford, 541 U.S. at 60 n.9 ("Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements").

**J.     Expert Testimony**

1.     Legal Standard

If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question. Rule 702. Expert opinion may be based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field. Rule 703. An expert may also provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact. Rule 704.

The Ninth Circuit has held that the admissibility of expert testimony generally turns on:

(1)     Whether the opinion is based upon scientific, technical, or other specialized knowledge;

(2)     Whether the expert's opinion would assist the trier of fact in understanding the evidence or determining a fact in issue;

(3)     Whether the expert has appropriate qualifications;

(4)     Whether the testimony is relevant and reliable;

(5)     Whether the methodology or technique the expert uses "fits" the conclusions; and

(6)     Whether the probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of time.

United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir. 2000).

Courts have admitted expert opinion testimony by law enforcement agents on a number of issues, such as the value of drugs, number of doses, and the modus operandi of drug traffickers.  See e.g., United States v. Espinosa, 827 F.2d 604, 612 (9th Cir. 1987) (holding that district court properly admitted law enforcement officer's expert testimony expert on the modus operandi of narcotics traffickers, including use of "stash pads" for drugs).  An experienced narcotics agent's opinion testimony may be based in part on information from other agents familiar with the issue.  United States v. Beltran-Rios, 878 F.2d 1208, 1213 n.3 (9th Cir. 1989).

### K.     Cross-Examination of Defendants

The United States is unaware whether any defendant intends to testify at trial.  If any defendant does testify, the United States should be permitted fully to cross-examine him because a defendant who testifies at trial waives his right against self-incrimination and subjects himself to cross-examination concerning all matters reasonably related to the subject matter of his testimony.  See Ohler v. United States, 529 U.S. 753, 759 (2000) ("It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination.").  A defendant has no right to avoid cross-examination on matters which call into question his claim of innocence.  United States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981).  The scope of a defendant's waiver is co-extensive with the scope of relevant cross-examination.  United States v. Cuozzo, 962 F.2d 945, 948 (9th Cir. 1992).

Moreover, if defendants Tate, Hill, or Ortega testify at trial, the government intends to introduce certified conviction records relating to some of their prior felony convictions.

### L.    Agent at Counsel Table

Under Rule 615, investigative agents are permitted to sit at counsel table throughout the trial even though the "agent is or may be a witness" because his or her "presence may be extremely important to government counsel, especially when the case is complex or involves some specialized subject matter."  Rule 615, Notes of Committee on the Judiciary, Senate Rpt. No. 93–1277.  See United States v. Farmer, No. 1:14CR362, 2015 WL 4661370, at *4 (N.D. Ohio Aug. 5, 2015) (permitting two case agents to sit at counsel's table where case involved an 8-year investigation, 23-count indictment, voluminous discovery, 39 witnesses, and expected to last 3 weeks).

### M.    Jury Nullification

The Court should exclude any evidence or argument relating to any possible jury nullification defense.  It is well-established that a defendant does not have a right to a jury nullification instruction.  United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992).  Having no right to seek jury nullification, defendant has no right to present evidence relevant only to such a defense.  Zal v. Steppe, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring) ("[N]either a defendant nor his attorney has a right to present to a jury evidence that is irrelevant to a legal defense to, or an element of, the crime charged.  Verdicts must be based on the law and the evidence, not on jury nullification as urged by either litigant.").  And, in any event, under Federal Rules of Evidence 401 and 403, such arguments or evidence are not relevant to any valid defense to the offense charged and will unnecessarily confuse the issues and mislead the jury.

In particular, the defendants in this case should not be permitted to introduce evidence concerning their employment, the financial dependency of family members, or difficult upbringings, since none is relevant to any material issue and their minimal

probative value is substantially outweighed by the risk of unfair prejudice and confusion of the issues.  See Rule 401, 403.

### N.     Reciprocal Discovery and Affirmative Defenses

No defendant has produced to the government any reciprocal discovery to which the government may be entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure.  Further, no defendant has not provided the government with notice of any affirmative defenses.  Therefore, to the extent defendants attempt to introduce or use any documents at trial that he has not produced, or seeks to rely on an undisclosed affirmative defense, the government reserves the right to object and to request that the Court exclude those undisclosed documents or affirmative defense.  See United States v. Young, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

In addition, defendants also have not provided the government with any information regarding the witnesses they intends to call at trial.  The government needs the opportunity to evaluate permissible impeachment material, in order to properly cross-examine those witnesses, and the government does not wish to delay the trial by requesting avoidable recesses.  In order to eliminate the need for the government to request a brief recess after the direct testimony of any of the defense witnesses, the government asks that the Court require defendants to provide the government with any information necessary to collect potential impeachment material, including the full name and birthdate of any witnesses (for purposes of conducting, e.g., criminal history inquiries) at the outset of the defense case.

## VI.    CONCLUSION

The government respectfully requests leave to file such supplemental memoranda as may become necessary during trial preparation and trial.